# United States Court of Appeals

## For the First Circuit

No. 07-2694

BONNIE CHALOULT,

Plaintiff, Appellant,

v.

INTERSTATE BRANDS CORPORATION,

Defendant, Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Guy D. Loranger with whom Nichols, Webb & Loranger, PA were on
brief for appellant.
Robert W. Kline for appellee.

August 28, 2008

**LYNCH**, **Chief Judge**.  Bonnie Chaloult sued her former employer, Interstate Brands Corporation ("IBC"), alleging she had suffered sexual harassment by her supervisor, Kevin Francoeur, in the six months before she quit her job.  The district court entered summary judgment for the employer.

The issue on appeal turns on the affirmative defense available to employers when the harassment is by the plaintiff's supervisor.

Under Title VII, an employer is subject to vicarious liability for sexual harassment by an employee's supervisor which does not constitute a tangible employment action.  But the employer may prevail if it demonstrates a two-part affirmative defense: that its own actions to prevent and correct harassment were reasonable and that the employee's actions in seeking to avoid harm were not reasonable.  See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  This case turns on the Faragher-Ellerth affirmative defense.

The question here concerns the employer's affirmative defense that it is not vicariously liable because on summary judgment it has established that (i) the employee's own actions were not reasonable (here plaintiff did not herself complain to management); (ii) the employer had reasonably set up and educated employees on appropriate procedures for handling sexual harassment

allegations; (iii) the employer did reasonably investigate the original allegation plaintiff made to management at the time of her resignation; (iv) no one at a managerial level equal to or superior to the harasser had notice of the different allegations of harassment made in the lawsuit; and (v) the co-worker who had some notice of some of the different allegations did not consider the conduct he knew of to be harassment and did not call it to the attention of management.

The plaintiff-employee argued that as a matter of law the knowledge of a co-worker with the title of supervisor, who was in fact a peer of the plaintiff's and who also reported to the harasser, was attributed to the employer under the company's policy and that defeats the Faragher-Ellerth defense. The district court rejected the plaintiff's argument.

Conducting our independent review of the record, we find the employer made out its Faragher-Ellerth defense to vicarious liability. We affirm the entry of summary judgment for the employer.

I.

We describe the facts, drawing all inferences in the plaintiff's favor, as we must do in summary judgment. Mellen v. Trs. of Boston Univ., 504 F.3d 21, 24 (1st Cir. 2007).

Bonnie Chaloult began working at IBC's Biddeford, Maine production plant in June 1999. In July 2004, when an entry-level

bread supervisor position opened up, Chaloult applied for and received it, and she began working as a bread supervisor in September 2004. When she first started working as a supervisor, she was in production, then she was moved to wrapping, and then back to production. When she was moved back to production in February 2005, her immediate supervisor became Kevin Francoeur, who was the assistant production manager. At that time, Chaloult's shift was the night shift, from 10 p.m. to 8 a.m.

On June 8, 2005, Chaloult and other supervisors attended a "WARN meeting," under the Worker Adjustment Rehearing Notification Act, at which they were put on notice that their positions could potentially be eliminated in sixty days. This was occasioned by the company's going into bankruptcy. Chaloult understood that this could mean she was out of a job as of August 12, 2005. Chaloult conceded at deposition that her attendance at work "deteriorated" after this meeting, and other evidence supports this.

At no time prior to her resignation did Chaloult complain about sexual harassment.

After an incident with a co-worker,[1] on August 4, 2005, Chaloult submitted a letter of resignation. Chaloult was pregnant when she left IBC in August 2005, and was not re-employed until June 30, 2006. The letter of resignation stated, verbatim:

> I respectfully request to give forth my two week notice, in accordance with the companies involuntary leave slip, my last date of work will be 8/19/05.
>
> I would like to take the time to thank you, (Paul) and IBC for the experience I now have under management.
>
> However, when I filled out my application for employment with IBC, it never stated that at any time would my supervisors above me, have the right to question my personal affairs and demand information.
>
> This I learned from yet another supervisor being accused of fore-play.
>
> Is this company Policy? I tried to change shifts, told I had day hours for 6-strap production then I was denied. I no

---

[1] The record shows that Chaloult was having a dispute with an oven operator named Dobre in late July 2005. Sue Bisson wrote a "To whom it may concern" letter, dated August 3, noting two incidents: on July 28, Chaloult told Dobre not to call a mechanic regarding a problem with the oven because he was causing the problem, but it turned out that a mechanic was needed and the mistake was not Dobre's. On July 29, Chaloult told Bisson that Dobre was making another mistake involving machinery, which Bisson informed Chaloult was not Dobre's fault, at which point Chaloult "proceeded to walk out of the office and leave." On July 30 or 31, Chaloult wrote a report stating that Dobre had shoved equipment and made a loud noise as she walked by.

The parties have not argued that the tension between Chaloult and Dobre (and apparently Bisson) is related to her problems with Francoeur, but it does suggest that she was unhappy at work for reasons unrelated to Francoeur in the days before she wrote her letter of resignation on August 4.

longer feel comfortable working for this supervisor.

The letter did not directly accuse her supervisor of harassing her, but of questioning her personal affairs with another supervisor, a situation she learned about from the supervisor who, she said, was accused of having a sexual relationship with her. The letter did state she no longer felt comfortable working for her own supervisor.

Chaloult put her letter into the mailbox of her department manager, Paul Santos. Santos met with her the first day he was back at work after receiving the letter. Before meeting with Chaloult, Santos discussed her letter with Joseph Cabral, Assistant Human Resources Manager, and gave a copy of the letter to Human Resources so they could put it on file. Cabral and Santos decided that Santos should ask her what the letter meant, since they did not know to what she was referring.

At the meeting, Chaloult said she was referring to an incident that had taken place on July 15, in which Francoeur had approached a co-worker, Jim Anderson, and demanded to know whether Anderson and Chaloult were having sexual relations. Chaloult, who had a fiancé at the time, had not been present during this conversation and said that Anderson had told her about it the following morning.

When asked why she did not come forward sooner, she told Santos that she was worried about issues "coming back at me." She

did not say to Santos that there had been any other incidents of concern involving Francoeur. At deposition she admitted there was nothing that prevented her from reporting other instances to the company.

Santos told her that he would follow up with both Anderson and Francoeur and report the incident to Human Resources. Santos did what he promised. Immediately after his meeting with Chaloult, Santos called Cabral and briefed him. Santos then called Francoeur into his office; they met for about half an hour. He told Francoeur what Chaloult had said. Francoeur said that was not what happened. Francoeur explained his version of what happened to Santos as follows:

> [H]e explained to me that he had been calling for both [Anderson and Chaloult], he had tried calling for her, tried calling for him on the radio, neither one of them were responding on the radio. He was walking from the six strap makeup area going towards the wrap office. He had passed Bonnie in transit or she was going -- he noticed her going one way towards makeup, and he was going towards wrapping. He walked into the wrap office and said, Jim, what, are you and Bonnie fucking with me, screwing with me? And he said that Jim started laughing. He was like, no, we didn't hear the calls on the radio. And that's pretty much it.

Santos made Francoeur write down his version of events.  The document was submitted into evidence and is consistent with Santos's description of the meeting.[2]

Santos then met with Anderson.  Anderson told Santos:

> [Francoeur] just came in and was like, what, are you and Bonnie trying to fuck me?  I was like, okay.  I go, what else was said?  He was like, nothing.  We just laughed and he wanted some numbers, and I went out on the floor and that was it.  He says he was trying to call us.  I didn't hear him.  Maybe our radios were down, and that was it.

During the interview Santos also asked Anderson what he said to Chaloult.  Santos described his conversation with Anderson as follows:

> [I asked] what did Kevin say to you?  What do you recall Kevin saying to you?  He said, he just came in and he was like, what, are you and Bonnie trying to fuck me?  I was like, okay.  I go, what else was said? He was like, nothing.  We just laughed and he wanted some numbers, and I went out on the floor and that was it.  He says he was trying to call us.  I didn't hear him.  Maybe our radios were down, and that was it.  I go, so he didn't come in and ask if you guys were fucking?  He said, no.  No, he just came in and he wanted to know if we were fucking with him.
>
> . . . .
>
> I said, Bonnie is saying that you went to her and told her that Kevin asked you if you and her were having sex.  He was like, oh, I don't remember what I told her.  I go, well, you

---

2 At his deposition, Francoeur confirmed Santos's account of their meeting and of his statement to Anderson.  There is no evidence to the contrary.

just told me that he came in and asked if you two guys were fucking with him and then you turn around and went to Bonnie and told Bonnie that Kevin asked if you and her were fucking. I go, so which one is it? He was like, no, he just came in and he said if we were fucking him. I was like, so then why did you go to Bonnie and tell her something different? And he made a comment about, oh, Bonnie and I were just laughing about it, we were joking about it, and that was it. I was like, well, it's not a joking matter because this is where we're at right now.

When he received Francoeur's statement, Santos discussed the matter with Cabral. They concluded that what Francoeur had said to Anderson was "are you guys fucking with me?" As a result, Francoeur was given a letter, dated September 1, 2005, warning about the use of inappropriate language ("fuck") and language which could be taken out of context in the workplace. The letter stated: "While our investigation to date shows that the broad allegations made by the employee may not be 100% confirmed, it is clear that, based on your admission, that your comment was inappropriate and unwarranted." It also made clear that "[a] manager must never discriminate, harass, or retaliate against any employee. If a Manager knowingly condones discrimination, harassment, or retaliation by another, the Manager will be considered to have personally engaged in the conduct."

After Chaloult gave her two week's notice on August 4, she worked only a few more days and did not show up to work after August 8. As a result, IBC did not have the opportunity to conduct

its usual exit interview. On November 11, Chaloult met, at his request, with Joseph Cabral; no specific information is provided about this meeting, and there is no evidence that Chaloult told Cabral the allegations she later made. Chaloult also filed an exit comment form, dated November 11, 2005, in which she made the comment: "Sexual harassment from upper management for an ongoing period with other people . . . involved." Santos stated that he did not see this exit comment form. He said he first became aware of Chaloult's other allegations after she filed suit.

On October 10, 2006, more than a year after she left her employment, Chaloult filed suit in federal district court against IBC, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), and the Maine Human Rights Act. She sought general, non-economic, and punitive damages. Chaloult alleged that she was sexually harassed by her superior, Francoeur, from February 5, 2005, when she first reported to Francoeur, to August 2005, when she left the company. For the first time she related a number of very specific complaints about other statements.

Chaloult's testimony at deposition included the following specific allegations, which she had not mentioned to Santos or in her November 11, 2005 exit comment form.[3] One claim of harassment

---

[3]    For summary judgment purposes, we use her testimony at deposition. Her testimony is materially different from some allegations in her unverified complaint. For example, Chaloult

-10-

is that Francoeur frequently complained about his wife and his lack of sexual relations with her. At deposition, Chaloult said Francoeur made these comments openly to supervisors and also said he wished he could murder his wife. Chaloult did not report the comments to anyone.

Further, there were comments about breasts. On several occasions when they were outside on break during the winter, Francoeur asked Chaloult about the distance between her nipples and told her to go home and measure this distance. He also at one point asked if her nipples chafed or stood out like headlights. She walked away and shook her head but did not report the comments to anyone. At some point Chaloult walked into an office where Francoeur was in conversation with another worker named Steve Leclair and, without using her name but looking right at her, Francoeur indicated that Chaloult's breasts were "melons. Big hooters." Chaloult did not report this incident and stated that nothing prevented her from doing so.

Once, when they were alone in his office Francoeur asked Chaloult to hold her breath and push her chest out. She did not understand why he made the comment. She shook her head and walked off, saying nothing to Francoeur and not reporting the incident.

testified that Francoeur never asked to see her nipples although that was alleged in the complaint. Chaloult's complaint stated that Francoeur would tell her that "she looked like she needed to get laid," but at deposition she said that it was a female co-worker who made that comment.

-11-

She said she did not report it because she did not "want any retaliation coming back."

She said statements about her relationship with her boyfriend were harassing. Chaloult had broken up with her boyfriend in January of 2005. She got back together with him in April and they became engaged in May 2005. Francoeur made comments to her to the effect she should not get back together with her boyfriend. The more serious allegation is that toward the end of spring, Francoeur offered to come over to her house and have sex with her; specifically that "he'd come to my house and show me what fucking was about." Chaloult said that Anderson and a few maintenance people were in the area at the time Francoeur made this comment. Chaloult walked away, spurning the offer. Chaloult did not report the incident.

Another time, Chaloult joined Francoeur and Anderson on a patio for a smoke. Chaloult and Anderson were discussing a motorcycle trip that Chaloult had made with her boyfriend. Francoeur made the statement, "well, girls who ride motorcycles normally like it from the back side, huh? Is that true, Bonnie[?]" Chaloult turned and walked off, and shook her head. She did not report Francoeur for that statement; nothing kept her from reporting it.

In another instance, Chaloult, another supervisor named Dan Lariviere, and Francoeur were sitting in an office and

-12-

Lariviere was eating an eclair.  Francoeur said he wanted to see how far Chaloult could stick the eclair down her throat.  Lariviere said he would also like to see that.  Then Francoeur said "[i]f there isn't enough cream in there, . . . I have plenty."  Chaloult said nothing to either of them or to anyone in management above Francoeur about this.[4]  She "may have" told Anderson about the incident.

At some time in May, Chaloult had picked up a piece of dough off the machinery, and Francoeur made a comment to her that "if the dough ball wasn't enough for me to play with, he had some balls that I could play with."  Chaloult stated that a production employee named Amy Ramsell was present when Francoeur made this comment, but she is not sure whether Ramsell heard it.  Chaloult walked off and did not report the incident; she stated that nothing prevented her from reporting it.

In another instance, Chaloult was apparently in a bit of a frenzy in the presence of other workers over having misplaced her key card to get into the building.  A female employee in the office, Sue Bisson, said "it looks like somebody needs to get laid.  Kevin [Francoeur] turns around and goes yeah, I guess so.  Because

---

[4]  Francoeur also denied making the statements plaintiff attributes to him as evidence of harassment, including the offer to go home with her, but we take plaintiff's version as true for summary judgment purposes.  As to the eclair statement, Francoeur said it was made by another supervisor, Dan Lariviere, and that afterwards he told Lariviere that the statement was inappropriate.

I was apparently a little too hyper."  Chaloult did not complain to either of them or report them and nothing prevented her from doing so.

Finally, on July 15, as discussed above, Francoeur allegedly walked into an office where Anderson was doing some paperwork and yelled at him, "so how long have you and Bonnie been fucking?"

There were no objectionable statements by Francoeur between July 15 and Chaloult's letter of resignation on August 4.[5]

IBC had in place anti-sexual-harassment policies which included methods for reporting harassment.  The company's Equal Employment Opportunity Policy stated:

> Interstate strictly prohibits sexual harassment. . . . Examples of the prohibited conduct include unwelcome sexual advances, requests for sexual favors, and gender slurs or other offensive, derogatory, or demeaning comments, jokes, graffiti, or other verbal or physical conduct and written or taped materials relating to gender.

———————. . . .

_____

[5]    Chaloult decided to keep a contemporaneous diary of Francoeur's comments.  In that diary, she made no mention of Francoeur's comments about coming over to her house to have sex; no mention of the alleged incident involving dough balls; no mention of Francoeur's gestures about melons, which she took to be about her breasts; nothing about Sue Bisson's comments; and nothing about Francoeur's comment about girls who ride motorcycles.

The diary did include references to Francoeur's complaining about his wife, but nothing about comments regarding his sexual relations with his wife.  The diary also did refer to Francoeur's comments about the distance between Chaloult's nipples, chafed nipples, and the eclair incident.

> Any person who believes that the person has been subjected to discrimination, harassment, or retaliation or who knows of possible discrimination, harassment, or retaliation against anyone else should immediately report it to supervision or to Richard W. Morgano, [phone number redacted] or to Rhonda Tracy, [phone number redacted]. Do not wait until a situation is severe or pervasive; report any possible discrimination or harassment or retaliation as soon as you know of it.

Chaloult signed an updated version of this policy on September 16, 2003, indicating that "I . . . have read and understand IBC's Equal Employment Opportunity Policy and have participated in 'In this Together' Harassment Training."

Chaloult had also signed, when she first began working for the company on June 10, 1999, the company's Sexual Harassment Policy, which included the following provisions:

> II. Awareness
>     A. Supervisors must be sensitive to the problem of sexual harassment.
>     B. Employees shall be encouraged to report an incident of sexual harassment to their supervisor.
>     C. If a supervisor becomes aware of any violation or possible violation of the EEOC guidelines, the incident should be reported immediately to the human resources manager or plant general manager.
>     D. Supervisors have an affirmative duty to keep their work area free from sexual harassment of any kind and shall take appropriate steps to prevent and eliminate such harassment.

Chaloult was also aware that IBC had a confidential toll-free complaint line for employees.

Chaloult admittedly did not at any time before submitting her letter of resignation make any complaint about Francoeur to the Human Resources manager, the plant manager, or to any other person who was superior or equal to Francoeur's level at the company.

When asked at deposition why she did not come forward sooner with her complaints, Chaloult responded, "I had talked with Jim Anderson, and Jim Anderson knew about these comments." When asked whether she had asked Anderson to report her concerns to management, Chaloult stated that she had not. She asserted that Anderson was present at the time of Francoeur's comment about measuring the distance between nipples, when Francoeur made the comment about girls who ride motorcycles, and when Francoeur told Chaloult that he wanted to come over to her house and have sex with her, and that he told her about Francoeur's comment suggesting that Chaloult and Anderson were having a sexual relationship on July 15.

Chaloult and Anderson were peers; they, along with one other person, were entry-level supervisors on the overnight shift in the bread department; Francoeur, as the assistant bread production manager in charge of the overnight shift, was their direct supervisor. There were also three other entry-level supervisors in the bread department who worked during a second shift.

At deposition, Anderson confirmed that it is his understanding that if supervisors receive a complaint of sexual harassment, they are supposed to report it right away. However, when asked whether he was ever aware of behavior which could have violated the company's sexual harassment policy, he said that he was not. When asked whether anyone had ever complained to him about conduct that could have been construed as sexual harassment, Anderson said no.

Anderson further testified that he was never present when anyone objected to something that Francoeur said, nor did he ever get the impression that something Francoeur said upset someone. Anderson testified that the group of supervisors of whom he and Chaloult were part got along "pretty good. I mean, we were loosey goosey. We joked around with each other."

As to Chaloult's specific allegations of harassment, Anderson said that one day Francoeur said to other workers during a smoke break that he had heard people on a radio program referring to the distance between nipples as "spread points," and "we all got a laugh out of it." Anderson said that Francoeur asked a group of people, not just Chaloult, to measure their "spread points." More specifically, "[h]e made a general statement for all of us to go home and do it. . . . I didn't think nothing of it at the time. I didn't think there was nothing wrong because we all just laughed about it and we left the office." When asked whether he thought

that Francoeur violated the company's sexual harassment policy when he made comments about "spread points" to a group of people that included women, Anderson stated, "I didn't read nothing into it because we all had a chuckle about it.  So, I mean, I don't think any of us read anything into it because we all laughed and went on . . . ."  Chaloult has not called this testimony into question.

Anderson had a different recollection of the incident involving an eclair.  He stated that one day he, Francoeur, Chaloult, and Lariviere were eating a box of eclairs they had brought back from the shipping dock, something that they did fairly often.  On this particular occasion: "Bonnie would take a bite of one and Kevin [Francoeur] made a noise out of his mouth.  Then Dan had said, like, how far can it go.  And we all laughed, and that was the end of that.  We finished eating, and we all went back out on the floor."  Anderson testified that of all the times when they ate eclairs, this was the only occasion when a comment was made about someone putting an eclair in their mouth.  He did not consider this to be sexual harassment.[6]

Anderson also testified that Francoeur once in a while talked about his own nipples being chafed or irritated.  One time, when Chaloult as well as others, both male and female, were

---

[6]   When asked whether he knew if Lariviere had been disciplined for his comment, Anderson stated that was "none of [his] business . . . as far as an entry-level supervisor.  Only upper management would know if something like that happened."

-18-

present, Francoeur asked if other people had hard nipples. Anderson said that he heard Francoeur talk about the breasts of female employees "once or twice," but never about Chaloult's in particular, and never in her presence. When asked why he did not report to management Francoeur's comments about breasts, Anderson replied that Francoeur "was talking to me -- I mean, at that point I felt it was a guy to guy talk. I mean, you just talk; and I didn't really think nothing of it. I mean, it was just me and him in the office or outside." Again, Anderson did not consider this to be harassment. Chaloult has not rebutted this testimony.

With respect to the incident Chaloult referred to in her letter of resignation, Anderson testified that Francoeur did not ask him whether he and Chaloult were having sexual relations. Rather, Francoeur came into the office where Anderson was sitting and asked whether Anderson and Chaloult were "f[]ing with him" by not answering their radios because Francoeur had unsuccessfully been trying to get a hold of them. Anderson said that he told Chaloult about the episode a few days later: "[I]t got worked into the conversation . . . . I was telling her, Kevin came in the office and he was pretty mad that we weren't answering our radios and he asked if we were F-ing, if we were F-ing with him and stuff like that." Chaloult also has not called this testimony into question.

Anderson testified that Chaloult never asked him to do anything with, or about, Francoeur's comments. There is no testimony from Chaloult that she ever used the term "sexual harassment" in her conversations with Anderson about Francoeur.

II.

The Supreme Court has rejected the idea that an employer is strictly liable for a hostile environment created by a supervisor when the employer neither knew nor reasonably could have known of the alleged misconduct. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 70-72 (1986).

In Faragher and Ellerth, the Court adopted as an alternative to an automatic liability rule an affirmative "composite" defense under which an employer may show, under the first prong, that "the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur," and, under the second prong, that "the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." Faragher, 524 U.S. at 805.

We separately evaluate the two prongs, recognizing that there may be a relationship between the two. For example, if the company has not provided information about a complaint procedure, that may affect whether the employee's failure to use the procedure is reasonable, and vice versa. Reasonable effort is required on

-20-

both sides.  As we said in <u>Reed</u> v. <u>MBNA Marketing Systems, Inc.</u>, 333 F.3d 27 (1st Cir. 2003), the Supreme Court "certainly knew[] its regime necessarily requires the employee in normal circumstances to make [the effort to put the company on notice] <u>if the employee wants to impose vicarious liability on the employer and collect damages under Title VII</u>."  <u>Id.</u> at 35; <u>see also, e.g.</u>, <u>Freytes-Torres</u> v. <u>City of Sanford</u>, No. 05-15805, 2008 WL 763216, at *3 (11th Cir. Mar. 25, 2008); <u>Nurse "BE"</u> v. <u>Columbia Palms W. Hosp. Ltd. P'ship</u>, 490 F.3d 1302, 1309-12 (11th Cir. 2007); <u>Hardage</u> v. <u>CBS Broad., Inc.</u>, 427 F.3d 1177, 1186 (9th Cir. 2005).

Plaintiff does not contest that IBC has met the second prong of the <u>Faragher</u>-<u>Ellerth</u> defense.  The district court found that Chaloult had waived any challenge to the company's claim that she had not acted reasonably by failing to report the harassment. We take it as true[7] then that Chaloult "unreasonably failed to take advantage of any preventive or corrective opportunities provided by

---

[7]     Clearly Chaloult's behavior in not complaining was not reasonable.  There is absolutely no evidence of Chaloult's having "more than ordinary fear or embarrassment," as <u>Reed</u> v. <u>MBNA Marketing Systems, Inc.</u>, 333 F.3d 27, 35 (1st Cir. 2003), requires. To the contrary, Chaloult was a supervisor herself who had worked for the company for over five years.
        In <u>Reed</u>, this circuit held that a jury question was presented on the second prong regarding whether it was unreasonable for a seventeen-year-old plaintiff to fail to complain about her supervisor's sexual assault when the supervisor was twice her age and told her that they would both be fired if she reported and that his father was good friends with the company's owner.  <u>Id.</u> at 37.

the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807.

Chaloult has posed the question as one under the first prong of Faragher-Ellerth, that is, whether the company acted reasonably. We agree that, depending on the facts, there may be instances in which the employee acted unreasonably, but the employer also did not exercise reasonable care. But that is not the case. Chaloult concedes that IBC did have an acceptable sexual harassment policy and complaint process in place, that the company had trained its employees regarding its policies, and that Chaloult knew of these policies. Chaloult thus concedes that the employer has met the initial aspect of the first prong -- that the employer took reasonable care to avoid sexual harassment. She argues that the employer failed to meet the second aspect -- that the employer failed to take reasonable care to eliminate harassment when it might occur.

Specifically, Chaloult argues that Anderson's putative knowledge of Chaloult's being harassed in the manner described in the lawsuit must be attributed to IBC, and that given the attributed knowledge, IBC failed to take appropriate corrective actions. It is important to note that there is no claim of any actual knowledge on the part of any IBC personnel who were superior to Francoeur, or anyone superior to Chaloult, other than Francoeur. Nor is there a claim the company routinely ignored harassment

-22-

complaints or that there were prior complaints against others. Moreover, Chaloult does not claim that the company acted unreasonably in responding to a complaint after she submitted her letter of resignation and put it on notice of Francoeur's comments regarding an alleged sexual relationship between Chaloult and Francoeur.

Chaloult argues that case law requires imputation to a company of a co-worker's knowledge so long as the co-worker had any obligation to report harassment, and that the scope of the Faragher-Ellerth defense is defined, as a matter of law, by the company's own sexual harassment policies. Here, because the company voluntarily required all supervisors to report any harassment, as a matter of law the knowledge of anyone bearing the title of supervisor must be attributed to the company for purposes of the company's obligation to eliminate harassment.

We disagree with the plaintiff's argument. Given the combination of factors from the events in this case, we think that the company was entitled to summary judgment under Faragher-Ellerth. Here, the employer had an appropriate policy, it was widely known and disseminated, it was known to the plaintiff, and the plaintiff failed to use the complaint procedures for the matters at issue. It is also clear, as to the second aspect of the first prong, that as to the one matter reported to the employer by plaintiff's August 4 letter, the company did act reasonably in

response.  The employer promptly interviewed Chaloult, Francoeur, and Anderson and concluded that Chaloult's account of what Francoeur said to Anderson was inaccurate, but that Francoeur should be punished for using inappropriate language.  Further, the complaint Chaloult made in her letter of resignation actually had to do with invasion of personal privacy and reasonably could be viewed as not being about sexual harassment.  The employer also reasonably viewed the matter as closed since Chaloult had raised no other issues in her letter or in her meeting with Santos.  Thus the employer was fully in compliance with the second aspect of the first prong of Faragher-Ellerth as to information of which management had actual notice.

Nor is there knowledge that should be imputed to the company that would render unreasonable its response under the second aspect of the first Faragher-Ellerth prong.  Chaloult argues that whatever Anderson knew must be attributed to the company and that what Anderson knew was the full range of behavior that Chaloult complains about in her lawsuit.  We outline our reasoning for rejecting Chaloult's proposition that the employer here was on adequate notice and failed to take appropriate steps.

Chaloult's position is not supported by the case law.  Chaloult relies on cases which she characterizes as holding that the unreported knowledge of sexual harassment by any employee bearing the title supervisor, even peers with no authority over the

-24-

harasser, is sufficient itself to attribute knowledge to the employer. As a general proposition this cannot be consistent with the defense outlined by the Supreme Court, which provides incentives for employers to develop sexual harassment reporting policies and to educate employees about and promote compliance with such procedures in order to avoid vicarious liability.

Chaloult relies heavily on Dees v. Johnson Controls World Services, Inc., 168 F.3d 417 (11th Cir. 1999), a case which is not at all like this. Dees concerned the adequacy of evidence that the harasser's supervisors had knowledge of the harassment and did nothing. In Dees, there was evidence that superiors of the harasser had actual knowledge of harassment prior to plaintiff's complaint. Specifically, a Human Resources employee told plaintiff that the employer was aware of prior sexual harassment in plaintiff's department, and plaintiff's superior informed her on multiple occasions that he had reported the harassment up the ladder "because he realized that [plaintiff] could not file a complaint herself." Id. at 422-23.

Chaloult's argument about attribution to the company turns on the fact that Anderson's title was supervisor. In fact, that was plaintiff's title as well. Anderson was her co-worker, and they both reported to the alleged harasser. This situation is unlike other cases in which people in management at levels above or at the same level as the harasser either observed directly or were

-25-

told of the harassment.  Cf., e.g., Arrieta-Colon v. Wal-Mart P.R., Inc., 434 F.3d 75, 81-82 (1st Cir. 2006); Dees, 168 F.3d at 423; Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 64 (2d Cir. 1998).

This raises the question of whether the company's voluntary adoption of a policy requiring all supervisors, regardless of whether they are co-workers, to report sexual harassment increases the scope of the company's legal liability as a matter of law under Title VII.  We think not, although one circuit has adopted such an approach.  See Clark v. United Parcel Serv., Inc., 400 F.3d 341, 350 (6th Cir. 2005).[8]  Adoption of this view would set a legal standard different from the Supreme Court's reasonableness approach in Faragher-Ellerth.  It would also discourage and penalize voluntary efforts which go beyond what the law requires.  And it would be inconsistent with approaches to voluntary efforts in other areas of Title VII law.  See, e.g., Walker v. Prudential Prop. & Cas. Ins. Co., 286 F.3d 1270, 1279 (11th Cir. 2002) (an employer's deviation from a voluntarily

_____

[8] The case Clark cites in support of this proposition, Coates v. Sundor Brands, Inc., 164 F.3d 1361 (11th Cir. 1999), says no such thing.  The language from Coates, that a company "itself answered the question of when it would be deemed to have notice of the harassment," was used in the context of whether an employee had sufficiently reported harassment to the company, not whether the company was liable for a co-worker supervisor's knowledge.  Id. at 1364.

adopted affirmative action policy cannot be used as evidence of pretext); Long v. Runyon, No. 92-6078, 1993 WL 264669, at *3 (6th Cir. July 12, 1993) (same).[9]

Even if all of Anderson's knowledge were imputed to IBC, this would not make IBC's actions unreasonable, since it is clear that Anderson did not consider himself on notice of harassment. Anderson testified that he did hear several comments by Francoeur which Chaloult attributed to Francoeur, but Anderson believed the comments were not harassing, and so there was no basis to report. As to the most suggestive of the alleged comments, i.e., that Francoeur offered to go and have sex with Chaloult, Anderson says he did not hear them. Chaloult did not testify that Anderson did hear them or that he must, of necessity, have heard them.[10] Anderson also testified that had he observed or known of any claims by Chaloult of harassment, he would have reported them up the chain.

---

[9] This does not mean that Anderson had no duty to report harassment under IBC's policy. But the existence of any such duty does not, as a matter of law, automatically impute to IBC all of Anderson's knowledge for the purpose of determining the reasonableness of IBC's actions under Faragher-Ellerth.

[10] In an affidavit accompanying her opposition to summary judgment, Chaloult added new information: that after Francoeur made the offer to go to her house and have sex with her, Anderson "said that Mr. Francoeur's behavior was getting worse, and, it would get him into trouble at some point." Since this statement is inconsistent with Chaloult's deposition testimony, we disregard it. Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 47 (1st Cir. 2008); Abreu-Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001).

-27-

The effect of the acceptance of plaintiff's argument would be to undercut the policy judgment the Supreme Court made in Faragher-Ellerth.  The defendant met the reasonableness standard.  This is not an instance in which the employer is trying to utilize its sexual harassment reporting chain to immunize itself from knowledge it actually had of the harassment allegations.[11]  Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1213-14 (8th Cir. 1996).  Rather, this is a case where the company was deprived of the opportunity to take remedial action because -- with the exception of the one incident Chaloult reported, which Santos promptly investigated and acted on -- Chaloult did not make allegations of sexual harassment until she filed suit over a year after leaving her job at IBC.

We affirm the entry of summary judgment for defendant.


**-Dissenting Opinion Follows-**

---

[11]     This is also not a case where the employer was aware of prior instances of Francoeur's harassment through complaints made by other people.  There is no indication that any complaints were made about Francoeur by anyone else at any time.

-28-

**LIPEZ, <u>Circuit Judge</u>, dissenting.** Three propositions underlie the decision of the majority to affirm summary judgment for IBC: (1) the terms of the sexual harassment policy that IBC chose to adopt should not be applied as written, (2) with the policy cast aside, Chaloult's unreasonable failure to take advantage of any preventive or corrective opportunities provided by IBC's sexual harassment policy (the second element of the <u>Faragher</u>-<u>Ellerth</u> affirmative defense) becomes the decisive factor in determining that IBC exercised reasonable care to prevent and correct promptly sexually harassing behavior (the first element of the <u>Faragher</u>-<u>Ellerth</u> affirmative defense), and (3) there is no genuine issue of material fact about whether Anderson was aware of the sexual harassment of Chaloult.

I disagree with each of these propositions. Therefore, I respectfully dissent.

I.

IBC's sexual harassment policy states without qualification:

> If a supervisor becomes aware of any violation or possible violation of the EEOC guidelines, the incident should be reported immediately to the human resources manager or plant general manager . . . . Supervisors have an affirmative duty to keep their work area free from sexual harassment of any kind and shall take appropriate steps to prevent and eliminate such harassment.

Although the majority acknowledges that Anderson was a supervisor, it insists that his awareness of sexual harassment could not be

-29-

attributed to IBC because Chaloult also was a supervisor on the same level as Anderson, and both reported to Francoeur, the alleged harasser. The majority also notes that no one in management at Francoeur's level or above had knowledge of the harassment. Therefore, according to the majority, IBC should be entitled to the affirmative defense.

The majority has added its own gloss to the company's clearly stated policy. As drafted, the policy did not qualify Anderson's obligations under the company's sexual harassment policy simply because he and Chaloult were supervisors at the same employment level. Likewise, as drafted, the policy did not qualify Anderson's obligations because the alleged harasser was the immediate supervisor of both Anderson and Chaloult.

Indeed, that policy demonstrates that IBC knew how to distinguish between a particular category of supervisor and supervisors generally. The "Awareness" section of the company's sexual harassment policy reads in its totality as follows:

> II. Awareness
>     A. Supervisors must be sensitive to the problem of sexual harassment.
>     B. Employees shall be encouraged to report an incident of sexual harassment to their supervisor.
>     C. If a supervisor becomes aware of any violation or possible violation of the EEOC guidelines, the incident should be reported immediately to the human resources manager or plant general manager.
>     D. Supervisors have an affirmative duty to keep their work area free from sexual harassment of

-30-

any kind and shall take appropriate steps to prevent and eliminate such harassment.

(emphases added).

Pursuant to this policy, employees experiencing harassment are specifically "encouraged to report an incident of sexual harassment to their supervisor." However, supervisors generally "must be sensitive to the problems of sexual harassment," and must "report immediately to the human resources manager or plant general manager" any violation or possible violation of the EEOC guidelines. They also "have an affirmative duty to keep their work area free from sexual harassment of any kind and shall take appropriate steps to prevent and eliminate such harassment."

Anderson understood that these obligations of a supervisor to deal with sexual harassment applied to him. As the majority points out, Anderson confirmed at his deposition that "it is his understanding that if supervisors receive a complaint of sexual harassment, they are supposed to report it right away." Although Chaloult never said to Anderson "I am being sexually harassed by Francoeur and I want you to help me," she alleges that she did complain to Anderson about Francoeur's conduct and she asserts that Anderson was aware of many of her encounters with Francoeur independently of any complaint by her. Yet the majority insists that Anderson had no legal obligation to do anything - and the company thus could not be found to have acted unreasonably - because IBC's policy requires more than Title VII demands. The

-31-

majority simply ignores as improvident or legally irrelevant IBC's policy choice to imbue all supervisors with the responsibility for reporting and preventing sexual harassment.[12]

Other courts have agreed that a company's stated sexual harassment policy is critical to an evaluation of the question posed by the first element of the affirmative defense -- whether "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). In Clark v. United Parcel Serv., Inc., 400 F.3d 341 (6th Cir. 2005), the court rejected the employer's argument that, as a matter of law, supervisors who "were not high enough in the company hierarchy and had no authority to control [the harasser]" had no duty to convey their knowledge of harassment to higher management. Id. at 350. The court observed that "[t]his argument might have merit but for the fact that UPS itself has, through its sexual harassment policy, placed a duty on

---

[12] In footnote 9 of its opinion, the majority states that it is not saying that Anderson had no duty to report harassment under IBC's policy. Rather, the majority insists that Anderson had no duty to report Francoeur's harassment of Chaloult under the circumstances of this case. Those circumstances include two indefensible legal propositions put forth by the majority. First, as explained above, the majority says that Anderson's status as a supervisor under the IBC policy does not matter here because Chaloult was a supervisor at the same level as Anderson and because the harasser, Francoeur, was the supervisor for both of them. Second, as I explain more fully in Parts II and III of the dissent, the majority says that Anderson's knowledge of Francoeur's treatment of Chaloult did not constitute awareness of sexual harassment as a matter of law.

all supervisors and managers to 'report[] incidents of sexual harassment to the appropriate management people.'" Id. (emphasis in original); see also Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999).[13]

The majority justifies its decision not to enforce IBC's policy as written on the ground that to do so would "set a legal standard different from the Supreme Court's reasonableness approach in Faragher-Ellerth." According to the majority, allowing knowledge of sexual harassment by "any employee bearing the title supervisor" to be sufficient to attribute knowledge to the employer is inconsistent with the Faragher-Ellerth affirmative defense, which "provides incentives for employers to develop sexual harassment reporting policies and to educate employees about and promote compliance with such procedures."

The majority misapprehends Title VII's "basic policies of encouraging forethought by employers and saving action by objecting employees." Faragher, 524 U.S. at 807. The animating principle of

---

[13] In Coates, the court held that when an employer's sexual harassment policy designates the people responsible for reporting misconduct, the company "itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures." 164 F.3d at 1364. The majority correctly notes that the court in Coates was considering whether an employee had sufficiently reported harassment to the company and did not address the issue of whether a company was liable for a co-worker supervisor's knowledge. Even with this factual distinction, the central point remains the same -- a company's own harassment policy answers the question of who within the company is responsible for reporting and responding to known incidences of harassment.

Title VII is "not to provide redress [for employment discrimination] but to avoid harm." Faragher, 524 U.S. at 806. By involving supervisors at all levels in the reporting and prevention of sexual harassment, IBC's sexual harassment policy seeks comprehensively to avoid harm. If the failures of a particular supervisor in the reporting of sexual harassment belie the promise of that comprehensive policy, a court should not forgive the failure of the supervisor by declaring the policy too ambitious.

Not surprisingly, I can find no other cases in which an employer prevailed on the first element of the Faragher-Ellerth affirmative defense because a court thought its sexual harassment policy imposed a broader reporting obligation than the law required. If the majority believes that IBC's policy states the reporting responsibilities of supervisors too broadly to justify vicarious liability, IBC should rewrite that policy, not the court.

II.

I agree with the majority that there may be instances in which there is a relationship between the two prongs of the Faragher-Ellerth affirmative defense. That is, facts relevant to an assessment of the unreasonableness of the employee in not taking advantage of any preventive or corrective opportunities afforded by a company's sexual harassment policy may also be relevant to an assessment of the reasonable care taken by an employer to prevent and correct promptly sexual harassment. Some of the cases cited by

-34-

the majority present such scenarios. For example, in Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship, 490 F.3d 1302 (11th Cir. 2007), an employee explicitly "requested that [her supervisor] not report the incident [of sexual harassment] and premised the complaint on [the supervisor]'s promise of confidentiality." Id. at 1310. Similarly, in Hardage v. CBS Broad., Inc., 427 F.3d 1177 (9th Cir. 2005), the employee told the supervisor with whom he had discussed the allegedly harassing behavior that he wanted to "handle the situation by himself." Id. at 1186. In Nurse "BE" and Hardage, the employee's conduct -- telling the supervisor not to address the harassment -- appropriately affected the court's inquiry into the reasonableness of the measures taken by the employer. However, those cases are inapplicable here because there the employees took affirmative steps to thwart their supervisors' compliance with the reporting requirements. Here, Chaloult merely failed to act. That is often the case in sexual harassment cases for many different reasons. That failure has no relationship to Anderson's responsibilities as a supervisor if he was aware of the harassing conduct by Francoeur.

The majority sees it differently. With its disregard of IBC's sexual harassment policy, it seeks to minimize the importance of Anderson's knowledge of Francoeur's conduct notwithstanding the obligation to report imposed on him by IBC's policy, and it makes Chaloult's failure to use the complaint procedures of the company

the decisive factor in deciding that the company acted reasonably. In effect, the majority double counts Chaloult's failure to report sexual harassment to higher management (once in each element of the affirmative defense). It gives little or no weight at all to Anderson's awareness of Chaloult's encounters with Francoeur. For this approach, the majority cites language from Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27 (1st Cir. 2003), where we said that the Supreme Court "certainly knew [] its [Faragher-Ellerth] regime necessarily requires the employee in normal circumstances to make [the effort to report sexually offensive conduct] if the employee wants to impose vicarious liability on the employer and collect damages under Title VII." Id. at 35 (emphasis in original).

This statement is merely an explanation of why there is a second element of the Faragher-Ellerth affirmative defense that focuses on the reporting responsibilities and conduct of the employee. That statement did not mean, because it could not mean, that the unreasonable failure of the employee to report sexual harassment trumps the failure of the employer to exercise reasonable care to prevent and correct promptly sexual harassment in a case where the employer has knowledge of the sexual harassment independently of any reporting by the employee. It is only because of the majority's insistence that Anderson's knowledge of Francoeur's treatment of Chaloult cannot be imputed to IBC under element one of the Faragher-Ellerth affirmative defense that the

-36-

majority can rule as a matter of law that IBC prevails on that defense.

## III.

Near the end of its opinion, the majority qualifies its insistence that Anderson's knowledge of Francoeur's treatment of Chaloult cannot be imputed to IBC. The majority says that "[e]ven if all of Anderson's knowledge were imputed to IBC, this would not make IBC's actions unreasonable, since it is clear that Anderson did not consider himself on notice of harassment." I do not understand how the majority can ascribe such dispositive significance to Anderson's alleged insensitivity to sexual harassment. Chaloult describes a number of encounters with Francoeur that Anderson admittedly witnessed. She also describes other encounters which she says Anderson was aware of and he denies it. Those encounters are central to my view that we must vacate the district court's grant of summary judgment. Taking the facts in the light most favorable to Chaloult - as we must - Anderson was aware of a series of episodes that a jury could view as sexual harassment. Even accepting only what Anderson acknowledges he heard and observed, a jury could still find that he should have reported the conduct to IBC and that his failure to do so is properly imputed to the company. The majority looks at those same encounters and sees grounds for affirming summary judgment.

-37-

It does so by the misapplication of the summary judgment standard. That misapplication includes an inappropriate effort to undermine Chaloult's credibility. The majority notes that Chaloult's contemporaneous diary of Francoeur's comments did not include all of the incidents alleged in the complaint; that she conceded in a deposition that her work deteriorated after she was put on notice that her position could be eliminated; and that she acknowledged her displeasure with her job for reasons unrelated to the alleged sexual harassment. Although these details are fair game for a trial, they have no place in the summary judgment analysis, where we are not permitted to draw negative inferences about Chaloult's credibility. That is a job for the jury at trial.

Then there is the majority's curious treatment of Chaloult's insistence that Anderson knew of some incidents that he does not acknowledge. For example, Chaloult alleges that Anderson and a few maintenance people were in the area when Francoeur told her that he was going to come to her house to show her what "fucking was about." The obvious import of Chaloult's statement is that Anderson overheard the remark. In response, the majority observes that Anderson says that he did not hear those comments. The majority apparently accepts Anderson's denial. In so doing, the majority distorts the summary judgment standard that requires us to take all facts in the light most favorable to Chaloult.

Finally, there is the majority's odd treatment of undisputed portions of the summary judgment record. It is undisputed that Anderson heard Francoeur: remark that women who rode motorcycles enjoyed sex from the backside after he learned that Chaloult had recently taken a motorcycle trip; make an inappropriate noise while Chaloult ate an eclair and another supervisor "asked how far can it go"; state that he had heard a radio program that discussed "spread points" between breasts; and ask other employees to measure their "spread points." With respect to this spread points incident, the majority recounts in detail Anderson's version, including his insistence that he "read nothing into it because we all had a chuckle about it." The majority then says that "Chaloult has not called this testimony into question," without explaining how or why Chaloult has to challenge Anderson's statement that he did not view this particular conduct as sexual harassment.

Anderson's dismissal of such conduct as "guy talk" and funny incidences that provoked laughter may only mean that he was a company supervisor who did not understand the nature of sexual harassment. Contrary to the inapt observation of the majority that Chaloult never "used the term 'sexual harassment' in her conversations with Anderson about Francoeur," Chaloult had no obligation to explain to Anderson the significance of what he was seeing. The testimony about those encounters described by Chaloult

-39-

should have been heard by a jury charged with determining whether Anderson was placed on notice of sexual harassment, which would then be imputable to IBC under the terms of its own sexual harassment policy.  Therefore, I respectfully dissent from the decision of the majority to terminate this case.