Idalia **RIVERA MALDONADO,**
Plaintiff,

v.

**HOSPITAL ALEJANDRO OTERO LO-PEZ** y/o **Manati Medical Center Dr. Otero Lopez; Nilda Paravisini,** and **Dr. Carlos Disdier, Defendants.**

**Civ. No. 05–1968 (PG).**

United States District Court,
D. Puerto Rico.

March 31, 2009.

Juan M. Frontera–Suau, Frontera Suau Law Office, San Juan, PR, for Plaintiff.

Juan Carlos Deliz, Raquel M. Dulzaides, Jimenez, Graffam & Lausell, San Juan, PR, for Defendant, Hospital Alejandro Otero Lopez y/o Manati Medical Center Dr. Otero Lopez.

## OPINION & ORDER

JUAN M. PEREZ–GIMENEZ, Senior District Judge.

Before the Court now is co-defendants Hospital Alejandro Otero Lpez (hereinafter "the Hospital"), Dr. Otero Lpez, Nilda Paravisini, and Dr. Carlos Disdier's motion for summary judgment (Dockets No. 25–26, 29), plaintiff Idalia Rivera–Maldonado's (hereinafter "Plaintiff" or "Rivera") response (Dockets No. 31, 52), and co-defendants' reply thereto (Dockets No. 44–45). After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the Court **GRANTS IN PART AND DENIES IN PART** co-defendants' motion for sum-

mary judgment for the reasons explained below.

## I. BACKGROUND

On September 12, 2005, plaintiff Rivera, a former employee of the Hospital, filed the present suit alleging that she was subjected to sexual harassment at work by her supervisor, Pedro Delgado ("Delgado"). According to the Plaintiff, Delgado incurred in sexual harassment by giving her unsolicited gifts, making unsolicited comments about her physical appearance, stalking her, touching her, intimidating her, and requesting sexual favors. *See* Docket No. 1 at ¶ 10–13, 16. Plaintiff also alleges that to the extent she rejected Delgado's advances, he threatened her with unjust disciplinary actions, such as suspensions without pay. *See id.* at ¶ 17. Rivera claims that she began to suffer both physically and emotionally as a result of Delgado's sexual harassment. *See id.* at ¶ 15.

In her complaint, Rivera further alleges that in November 2004, after being verbally abused and harassed by Delgado, she complained to Delgado's supervisor, Mr. Juan Picon ("Picon"), who in turn, informed the Hospital's Medical Director (Carlos Disdier) and Director of Human Resources (Nilda Paravisini) of Rivera's complaint. *See id.* at ¶¶ 18–19. According to the Plaintiff, Disdier and Paravisini gave Rivera a week off from work with pay, but allowed Delgado to continue working. They also informed her that upon her return, she would be assigned to a different area. *See id.* at ¶¶ 20–21.

Thereafter, Rivera reported to the State Insurance Fund ("SIF") due to the mental and emotional damages she suffered as a result of the sexual harassment she had to endure, *see id.* at ¶ % 22. However, she was duly released because the SIF does not cover damages stemming from illegal

acts, such as discrimination and sexual harassment, *see id.* at ¶ 25.

Although the Hospital accepted Delgado's resignation, Plaintiff alleges she has been unable to return to work due to the continuing emotional stress and anxiety over the harassment she suffered, and because of her fear of reprisals, *see id.* at ¶ 21.

In her complaint, Plaintiff seeks redress from the Hospital, Delgado, Disdier and Paravisini pursuant to Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. 2000e, *et seq.*, and several state laws, namely: Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29, § 146 *et seq.* (for gender discrimination); Law 69 of July 6, 1985, P.R. Laws Ann. tit 29, § 1321 *et seq.* (for gender discrimination); Law No. 17 of April 22, 1988, P.R. Laws Ann. tit. 29, § 155 *et seq.* (for gender discrimination and sexual harassment); Law 80 of May 30, 1976, P.R. Laws Ann tit. 29, § 185a *et seq.* (for wrongful discharge); and Law No. 115 of December 20, 1991, P.R. Laws Ann tit. 29, § 194 *et seq.* (for retaliation), for the sexual harassment, sex discrimination, reprisals and unjust dismissal she was a victim of.

Approximately six (6) months after filing the complaint, Rivera moved to dismiss without prejudice against defendant Pedro Delgado because she had been unable to locate and serve him, *see* Docket No. 12. As a result, this Court entered a partial judgment dismissing the claims against Delgado. *See* Docket No. 14. The remaining co-defendants timely answered the complaint (Docket No. 9) and eventually moved for summary judgment (Dockets 25–26, 29) raising raised the *Ellerth/Faragher* affirmative defense: that because the Hospital exercised reasonable care to prevent, investigate and correct any alleged sexually harassing behavior and the Plaintiff failed to use the corrective mechanism provided by the Hospital, Plaintiff's claims fail. In addition, the defendants maintain that Plaintiff never suffered a tangible employment action and that Title VII does not provide for relief against the remaining individual defendants.

## II. FACTUAL FINDINGS[1]

The following findings of facts are based on the supporting documentation submitted by the parties:

1. It has long been settled law that "[d]ocuments supporting or opposing summary judgment must be properly authenticated." *Carmona v. Toledo,* 215 F.3d 124, 131 (1st Cir. 2000) *(citing* Fed.R.Civ. P. Rule 56(e)). "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment." *Robinson v. Bodoff,* 355 F.Supp.2d 578, 582 (D.Mass.2005) (striking all exhibits that were submitted without affidavits). To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). 10A Wright, Miller & Kane, Federal Practice & Procedure § 2722 (3d ed.1998). After a careful review of the record, this Court finds that the Hospital's Exhibits 10, 11, 12, 14, 15, 16 & 17 were submitted without an authenticating affidavit or deposition testimony, and thus, are inadmissible for the purposes of summary judgment. Accordingly, the content of these inadmissible documents will not be considered as evidence in support of any statement of material fact.

In addition. Local Rule 10 requires that "[a]ll documents not in the English language which are presented to or filed in this Court, whether as evidence or otherwise shall be accompanied at the time of presentation or filing by an English translation thereof. . . ." The Court also notes that the Hospital's Exhibit 2, Dr. Disdier's deposition transcript, is in the Spanish language, and the Hospital failed to provide an English translation upon filing or thereafter. Consequently, its contents will not be considered. *See Gonzalez–Morales v. Hernandez–Arencibia,* 221 F.3d 45, 50 n. 4 (1st Cir.2000) (finding that appellants had waived arguments premised on documents for which they had not provided translations).

**Hospital Employees & Staff**

1. Co-defendant Manati Medical Center Dr. Otero Lopez (hereinafter "the Hospital") is a Hospital that provides general health care services in the Manati area. It has two hundred nineteen beds (219) and approximately eight hundred sixty five (865) employees. *See Defendant's Statement of Uncontested Facts ("DSUF")*, Docket No. 26, ¶ 1.

2. Co-defendant Nilda Paravisini (hereinafter "Paravisini") has been at all times relevant to this action Director of Human Resources of the Hospital. Paravisini has been an employee of the Hospital since September 8, 1987. *See* DSUF ¶ 2.

3. Co-defendant Dr. Carlos Disdier (hereinafter "Disdier") is the Hospital's Executive Vice–President and President of the Governing Board. He has occupied several positions in the Hospital, including Medical Director in 2001. *See* DSUF ¶ 3.

4. Idalia Rivera–Maldonado started working at the Hospital on March 7, 2000. She worked as the Domestic Services Secretary since she started working at the Hospital. *See* Docket No. 26, ¶ 4; Docket No. 31, *Plaintiff's Statement of Uncontested Facts ("PSUF")*, ¶ 1–2.

5. Delgado started working at the Hospital on September 16, 1986 as a "Warehouse Keeper". Thereafter, he worked as the Hospital's Housekeeping and Maintenance Director from August 10, 1995 until December 24, 2004. *See* DSUF ¶ 5.

6. Delgado had a consensual sexual relationship with Ms. Ncrisel Rivera, the Finance Director of the Hospital and member of the Hospital's Board. *See PSUF ¶ 5.*

7. Delgado was Rivera's supervisor. *See* DSUF ¶ 6.

8. Delgado was directly supervised by the Hospital's Director of Engineering, Mr. Picon who was in turn supervised by Dr. Disdier. *See* PSUF ¶ 4.

### The Hospital's Anti–Sexual Harassment Policy

9. The Hospital has a policy against sexual harassment, which is published in the Employee Manual and the Rules and Procedures for Conduct. When the Hospital amends its Sexual Harassment Policy, it distributes it to the employees as a handout. *See* DSUF ¶ 7.

10. The Hospital's policy against sexual harassment describes the procedures available to all employees for reporting, investigating, and preventing any act that may constitute sexual harassment. *See* DSUF ¶ 8.

11. The policy also establishes a confidential complaint procedure, in which the employee is instructed to immediately report any sexual harassment incident to the Director of Human Resources. Upon receipt of the complaint, the Hospital

---

Finally, plaintiff Rivera attaches a sworn statement signed by her wherein she attempts to create issues of fact, in particular with regards to her knowledge of the Hospital's sexual harassment policy and in direct contradiction to her deposition testimony. "[I]f prior statements under oath could be disavowed at will after a motion is made, the other side would be faced with a constantly moving target and summary dispositions made almost impossible." *Hernandez–Loring v. Universidad Metropolitana*, 233 F.3d 49, 54 (1st Cir.2000). As a result, this Court, in its discretion, will disregard Plaintiff's affidavit in support of her opposing statement of material facts.

will initiate an investigation and take disciplinary measures against any employee who violates the policy. *See* DSUF ¶ 9.

12. Newly hired employees are given an orientation regarding the Hospital's policies and are handed a copy of the Employee Manual. *See* Docket No. 26, Exhibit 7, *Paravisini's Deposition* 107:11–17.

13. In addition to publishing the Sexual Harassment Policy, the Hospital also offers additional training sessions to some of its employees on what constitutes sexual harassment and the mechanisms available at the institution to prevent such conduct. *See* DSUF ¶ 11.

14. When Rivera started working at the Hospital, she was given an orientation on the Sexual Harassment Policy and was also handed the Employee Manual and the Rules and Procedures for Conduct Manual that contain the policy prohibiting sexual harassment. Rivera signed a receipt evidencing that she received the Hospital's Sexual Harassment Policy. *See* DSUF ¶ 14.

15. Rivera read the Sexual Harassment Policy and its complaint procedure available. *See* Docket No. 26, Exhibit 3, *Rivera's Deposition*, 47: 7–13.

### Delgado's Alleged Sexual Harassment of Rivera [2]

Rivera alleges the following incidents took place:

16. The alleged sexual harassment incidents began on or about 2003 when Delgado started making comments to Rivera about her physical appearance. Delgado would tell Rivera that she looked pretty, elegant, and so on. In addition, in December 2003, Delgado gave Rivera a purse and some shoes as a gift. *See* PSUF ¶ 6.

17. On one occasion, after the 2003 Christmas party, Delgado told Rivera that he and a friend attorney had seen her and her daughter at

---

[2.] Defendants oppose most of the following facts claiming that Delgado's statements are inadmissible hearsay. *See* Docket No. 45 at pages 15–20, 24. "Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vazquez v. Lopez–Rosario*, 134 F.3d 28, 33 (1st Cir.1998). However, the Court of Appeals for the First Circuit has found that in the context of a summary judgment motion, statements by co-workers do not present hearsay problems because they are not offered for the truth, but, rather, to show that the words were spoken, and thus, contributed to the hostile work environment complained of by the plaintiff. *See Noviello v. City of Boston*, 398 F.3d 76, 84–85 (1st Cir.2005).

Most of the facts presented by the plaintiff, ..., satisfy [the summary judgment] standard. In large part, the chronicled events are within the plaintiff's personal knowledge. The insults and taunting that the plaintiff recounts do not create hearsay problems; those statements are not offered for their truth, but, rather, to show that the words were spoken (and, thus, contributed to the hostile work environment). They are, therefore, admissible.... The statements made by supervisors are admissible as non-hearsay statements of the defendant's agents made within the scope of their employment. *See* FED.R.EVID. 801(d)(2)(D).

*Noviello*, 398 F.3d at 84–85. Accordingly, the facts presented by plaintiff Rivera in the present case are not hearsay, and thus, admissible for purposes of the motion for summary judgment now before the Court inasmuch as they were made by Delgado in the scope of his employment in the Hospital. Viewing the proof in the requisite light, the Court will admit these statements for purposes of summary judgment.

the party and that the attorney commented that he would have liked to keep her daughter to which Delgado responded that he would like to keep the "mama". *See* PSUF ¶ 7.

18. Delgado would constantly follow Rivera around the Hospital, at lunch break and after working hours. *See* PSUF ¶ 9.

19. Delgado would get mad and scold Rivera when she danced with other male employees in Hospital's activities or when she went out to lunch with other male employees. *See* PSUF ¶ 10.

20. Delgado would also scold Rivera when she received any visitors at the office. *See* PSUF ¶ ¶ 11.

21. Delgado scolded Rivera and argued with her in a threatening manner because she did not use the gifts he had given her. As a result, Rivera began vomiting and had to go to the emergency room and get an "IV". *See* PSUF ¶ 12.

22. Delgado had the habit of pulling Rivera's hair as he walked behind her and would also give her perfumes as gifts. *See* PSUF ¶ 14.

23. Delgado did not like it when Rivera's husband went to the office to visit her. In one occasion, Rivera's husband was at the office and Delgado told him that Rivera was too much woman for him. *See* PSUF ¶ 16.

24. On more than five (5) occasions during the year 2004, Delgado sent Rivera flowers to her office at the Hospital. *See* PSUF ¶ 17.

25. Delgado would constantly make jokes of sexual nature at the office and made comments about the breasts and the butts of other female employees. *See* PSUF ¶ 18.

26. Delgado would also get close to Rivera and tell her that she had a pleasant odor. Delgado constantly made comments about women's body odors, including Rivera's. *See* PSUF ¶ 19.

27. On another occasion in which Rivera went to work without her uniform and wearing a long skirt and sandals, he told her "you smell good because you do not have a pantyhose on." *See* PSUF ¶ 20.

28. Delgado would have pornographic magazines, movies and cards in the office in areas where Rivera could see them. *See* PSUF ¶ 21.

29. On one occasion Delgado tried to force Rivera to enter into a bathroom with him which is located in the hallway. On that occasion Rivera tried to avoid him but he would step in front of her every time she would try to walk by him and kept her from being able to do so. *See* PSUF ¶ 22.

30. On another occasion Delgado came to the office on a Monday making comments about a party that his wife's son had had at a pool. He began making comments about his wife's son's girlfriends, her bikinis, her private parts and how much he had delighted himself in seeing them. Rivera was very affected by these comments. *See* PSUF ¶ 23.

31. Delgado would make fun of Rivera when she expressed her dislike of his conduct and he would call her "Santa Idalia de Calcuta". For example, at one point in time, Delgado was talking in his office about an X-rated movie he had seen and Rivera told him that she did not like to talk about those things and

Delgado called her "Oh, Saint Theresa of Calcutta" in front of Sonia Sanchez, Mr. Picn's secretary. This was done in the reception area of Delgado's office where Rivera's desk was located. *See* PSUF ¶ 24.

32. Every time Delgado would make a sexual harassment approach to Rivera she would be absent from work the next day. Delgado then would use this against her to threaten her with suspension without pay. On one occasion, Rivera was suspended for ten (10) days without pay allegedly because of her absences. *See* PSUF ¶ 25.

33. Between the months of September and October 2004, on at least two separate occasions, Delgado asked Rivera to have sexual relations with him at the office and assured her that nobody would find out about it because he had the key to the office were there were some hospital mattresses in the floor. *See* PSUF ¶ 32.

34. On October 2004, Delgado scolded Rivera because he wanted her to call him personally if she was going to be absent from work and not leave a message with other department employees. Delgado closed his office door and told Rivera that he was going to suspend her for ten (10) days without pay. At that time Rivera started crying and asked him not to pressure her anymore, that she could not take the pressure. Delgado told her that he did these things because he loved her. At that point in time Delgado tried to hug Rivera and she pushed him back and told him not to touch her. Delgado told her to forget about the ten (10) day suspension

and to take the afternoon off. *See* PSUF ¶ 33.

35. Some time during mid-October, Rivera was sitting at her desk, which is located sideways from Delgado's office door. Rivera heard Delgado call her and through the corner of her eye she saw him standing at the door of his office. Rivera turned towards Delgado to see what he wanted and her eye level was directly at Delgado's pant's zipper. She noticed that Delgado's penis was erected and she immediately looked away and stood up from her desk to leave the office, but the door was locked. Rivera had to unlock the door to step outside. *See* PSUF ¶ 34.

36. On November 24th, 2004, Rivera had to leave the Hospital after lunch break because of an emergency regarding her daughter. Rivera called the Hospital and she talked to Mr. Castellano instead because Delgado was not in. She explained to Castellano the reasons she was going to be absent. Delgado got mad at Rivera because she had not called him directly to his cell phone. *See* PSUF ¶ 35.

37. Castellano was a Supervisor in the Housekeeping Department. *See* DSUF ¶ 25.

38. Consequently, on November 26th, 2004, Delgado began screaming at Rivera scolding her because she had to communicate with him directly and not through Castellano, who was a "shitty supervisor". Delgado then began threatening Rivera, telling her that she had to amend her ways because the Human Resources Department was investigating her and that he was going to have to suspend her with-

out pay for ten (10) days. At that point in time, Delgado began to call Rivera names like "pendeja" and stupid. Delgado screamed at Rivera that she had to do things his way and not the way she wanted to. Rivera then told Delgado that she could not take this pressure anymore and that she was going to go to Human Resources to which Delgado replied not to go looking for trouble because if he wanted to he could injure her ("volar mi pellejo por toda la institucion") and that she could not beat him or stand up to him. At that point in time, Castellano came into the office and Delgado left the office. Rivera explained to Castellano what had happened and he told her to wait for her check, leave for the rest of the day and analyze things during the weekend, and then, if she considered it necessary, to file a formal complaint against Delgado on Monday, November 29th, 2004. *See* PSUF ¶ 36.

### Rivera's Sexual Harassment Internal Complaint

39. On November 29, 2004, Rivera informed the Director of Engineering, Mr. Picon, that Delgado had suspended her from employment for ten (10) days for not reporting to work and informing Mr. Castellano of her absence instead of him. She also told Picon that Delgado was sexually harassing her. *See* DSUF ¶ 16; PSUF ¶ 38.

40. Rivera became very nervous as she told Picon about the harassment incidents she had had to endure during the past months and that she did not know what to do anymore. *See* PSUF ¶ 39.

41. Rivera complained that Delgado harassed her during working hours, work-related activities and her lunch period. The alleged harassment included verbal insinuations with regards to Rivera's physical appearance and sexuality; stalking; touching her hair and body; rubbing his body against Rivera's body; getting close to her and breathing near her hair and neck and telling her how good she smelled; the pantyhose incident; Delgado's pattern of leaving pornographic movies and magazines in the office; Delgado's jealousy towards her; and locking her in the office with him in an intimidating fashion. Rivera also complained that Delgado requested sexual favors from her, including hugs, kisses and sex in the office. *See* Docket No. 1, *Complaint*, ¶¶ 13, 16; Docket No. 9, *Answer to Complaint*, ¶¶ 13, 16; DSUF ¶ 17; PSUF ¶ 40.

42. Rivera claims that she did not complain to Human Resources earlier because she was afraid the Hospital would not believe her, that she would lose her job and that nothing would be done to Delgado. *See* DSUF ¶ 17.

43. During the meeting with Picon, Rivera's demeanor was that of having fear. She was nervous and crying when describing Delgado's actions. Rivera seemed truthful to Picon. *See* PSUF ¶ 41.

44. As a result of Rivera's complaint, Picon immediately informed Disdier and Paravisini of Delgado's alleged harassing conduct towards Rivera. *See* DSUF ¶ 18.

45. That same day, a meeting was held between Disdier, Paravisini, Picon and Rivera. In said meeting, Riv-

era discussed Delgado's alleged harassing conduct and the November 26th, 2004 suspension incident. Rivera became nervous and began crying again. Thereafter, Rivera was informed that the Hospital was going to investigate her complaint. *See* DSUF ¶ 18; PSUF ¶ 44.

46. After Rivera explained the alleged harassing conduct she was experiencing and of the circumstances that led to her alleged ten (10) day suspension, Dr. Disdier informed Rivera that she was not going to be suspended and that she was going to collect for those days. *See DSUF ¶ 20.*

47. Disider and Paravisini decided to give Rivera the week off from work with pay, but decided to leave Delgado in his job. *See* Docket No. 1, *Complaint,* ¶ 20; Docket No. 9, *Answer to Complaint,* ¶ 20.

48. Paravisini told Rivera that she could be reassigned to another area and that she could come back to work the following Monday. *See* Docket No. 31, Exhibit 1, *Rivera's Deposition* at page 136.

49. Paravisini believed Rivera's account of events after observing Rivera's demeanor while recounting the incidents she endured under Delgado's supervision. *See* PSUF ¶ 47.

50. As part of the investigation, the Hospital interviewed Sonia Sanchez, Delgado, Rivera and Castellano. *See* PSUF ¶ 48; DSUF ¶ 22.

51. Rivera and Sanchez were interviewed on November 29th, 2004 and Delgado and Castellano were interviewed on December 1, 2004. All of these interviews were conducted by Paravisini. Picn only participated in Delgado's interview because he was his direct supervisor. *See* PSUF ¶ 49.

52. Sanchez backed up Rivera's account of the harassment incidents Sanchez had herself witnessed. *See* PSUF ¶ 50.

53. During the investigation, a witness confirmed that Delgado gave Rivera shoes as a gift. *See* Docket No. 9, *Answer to Complaint,* ¶ 10.

54. At some point during the investigation, Rivera was also told that if Delgado was found responsible for the acts, the Hospital would take disciplinary action against him or dismiss him. *See* Docket No. 26, Exhibit 3, *Rivera's Deposition,* 156:11–13.

55. On November 30, 2004, Paravisini met with Rivera to obtain a detailed narration of her allegations against Delgado. *See* DSUF ¶ 21.

56. On December 1, 2004 Paravisini and Picon met with Delgado to discuss Rivera's complaint. *See* DSUF ¶ 23.

57. At some point during the investigation, Disdier and Jose Quiros (hereinafter "Quiros") met with Delgado and gave him the option of either resigning or being terminated. Delgado agreed to resign effective December 23, 2004. *See* Docket No. 26, Exhibit 7 at page 102; Docket No. 31, Exhibit 4 at page 101.

58. Quiros is one of the owners of the Hospital. *See* DSUF ¶ 27.

59. The Hospital agreed to pay Delgado twenty five thousand dollars ($25,000.00), in exchange for a General Release Agreement. The Hospital took this decision to avoid le-

gal fees and litigation. *See* DSUF ¶ 29.

60. On Saturday December 3, 2004 Rivera went to the State Insurance Fund ("SIF") in order to receive treatment because of her emotional condition. *See* PSUF ¶ 55.

61. Rivera filled out the accident form at the SIF, and in the same she stated that "she suffers from sexual harassment at the workplace at the hands of her direct supervisor [who] made her offers to have sexual relations in the office with the door close[d] so nobody could come in and that in light of this she was emotionally and physically affected, that he constantly touch[ed] her hair and wanted to embrace her and kiss her." See PSUF ¶ 56.

62. On December 8, 2004, Rivera filed a charge of discrimination before the Anti–Discrimination Unit ("ADU") of the Puerto Rico Department of Labor. In said charge, Rivera expressly stated that she did not want to be transferred to a new position. *See* PSUF ¶ 57.

63. On December 9, 2004, Rivera went to the Hospital to give Picon a letter requesting that she be advised of the status of the investigation of her sexual harassment complaint. *See* PSUF ¶ 58.

64. On December 9, 2004, Rivera met with Dr. Disdier, Picon and Paravisini in Dr. Disdier's office. In that meeting Dr. Disdier told Rivera that he had examined her SIF Accident Form and that he encouraged her to rephrase the description regarding the sexual harassment. *See* PSUF ¶ 59.

65. Rivera took a sick leave until December 27, 2004 and presented a medical certificate to that effect. *See* Docket No. 26, Exhibit 1, Attachment V.

66. Rivera has not returned to work at the Hospital. *See* DSUF ¶ 30.

67. Rivera is receiving Social Security benefits. *See* DSUF ¶ 32.

68. Rivera still receives her medical insurance. *See* DSUF ¶ 34.

69. Rivera never received any termination letter from the Hospital nor was told that she would be terminated. *See* DSUF ¶ 35.

70. Plaintiff never asked to be reinstated. *See* DSUF ¶ 36.

### *Prior Alleged Incidents of Sexual Harassment*

71. Julia Colon (hereinafter "Colon") worked at the Hospital from May 27, 1997 until July 6, 1999 as Secretary of the Housekeeping Department. *See* DSUF ¶ 37.

72. On May 3, 1999, Coln sent to Julio Centeno Valentin (hereinafter "Centeno"), Director of the Engineering Department, a complaint about a situation in her work area. In essence, she complained that Delgado was aggressive, hostile and disrespectful towards her. She also complained that she had not been allowed to take vacations in two (2) years and that her keys to the Department had disappeared under mysterious circumstances. *See* DSUF ¶ 39; Exhibit 1, Attachment I.

73. Paravisini investigated Colon's complaint and concluded that Delgado had not given her vacation leave as per the Hospital's policy. *See* DSUF ¶ 40.

74. Colon requested to be transferred to another work area. *See* DSUF ¶ 41.

75. In a meeting on June 16, 1999, Paravisini offered Coln a position as Ward Clerk in the 4th Floor, which she accepted. *See* DSUF ¶ 41.

76. Colon resigned on July 6, 1999 because, according to her resignation letter, she had no one to take care of her daughter. *See* DSUF ¶ 37.

77. During her employment at the Hospital, Colon did not present a sexual harassment complaint against Delgado. *See* DSUF ¶ 38.

78. On September 22, 1999, Colon filed a charge before the ADU claiming that she was a victim of sexual harassment by Delgado. *See* DSUF ¶ 44.

79. As a result of the charge, Paravisini met with Delgado and discussed Colon's allegations. *See* DSUF ¶ 45.

80. The Hospital reached an agreement with Colon for fifteen thousand dollars ($15,000.00) in exchange for a full release. *See* DSUF ¶ 46.

81. Carla Freytes (hereinafter "Freytes") started working at the Hospital on February 1, 2000. She occupied the position of Housekeeping Maid under the supervision of Delgado. *See* DSUF ¶ 47.

82. During late April of 2000, Freytes presented a sexual harassment complaint against Delgado. She alleged that Delgado would tell her that she was pretty, that she smelled good and that her hairdo looked good. She requested a transfer from employment area. *See* DSUF ¶ 48.

83. Paravisini met with Freytes on April 27, 2000 to investigate the complaint. *See* DSUF ¶ 49.

84. Paravisini met with Delgado as part of the investigation on April 26, 2000. Delgado denied the allegations. *See* DSUF ¶ 50.

85. Freytes sent a handwritten note to Paravisini indicating that she wished to be transferred to another department and that she did not want to do anything against Delgado. *See* DSUF ¶ 51.

86. Freytes was transferred to the position of Clerk of the Laboratory. *See* DSUF ¶ 52.

87. Paravisini concluded that Delgado had not incurred in sexual harassment, however, she determined that he had engaged in improper conduct in the workplace. *See* DSUF, ¶ 53.

88. Therefore, on May 2, 2000, Paravisini, Miguel Bustelo, and Maritza Rodriguez met with Delgado and explained to him that the Hospital had the alternative of firing him or giving him another opportunity. He was given another opportunity because of his years of service and loyalty to the Hospital, and in consideration to his wife Noriselle Rivera. He was warned not to meet with female employees alone; not to make comments with sexual connotations; he had to agree never to engage in similar conduct. The Hospital warned him that he would not be given another opportunity if something like this situation would occur. Delgado agreed with the terms discussed. *See* DSUF ¶ 54.

89. Freytes resigned on March 9, 2001. *See* DSUF ¶ 55.

90. Rivera has no personal knowledge of what happened with Freytes' sexual harassment complaint against Delgado, nor why Freytes is no longer working in the Hospital. *See* DSUF ¶ 59.

91. She bases her conclusion that Delgado was not disciplined at the time on a comment made by him. *See* DSUF ¶ 60.

## III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. *Suarez v. Pueblo Int'l*, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. *See Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id.*

## IV. DISCUSSION

### A. Title VII Sexual Harassment Claim

■ Under Title VII of the Civil Rights Act, it is "an unlawful employment practice to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." *See* 42 U.S.C. § 2000e–2(a)(1); *see also Harris v. Forklift*, 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Title VII prohibits sexual harassment so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ To succeed on her hostile work environment claim, a plaintiff must establish the following:

> (1) that she ... is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Rivera–Martinez v. Commonwealth of Puerto Rico,* No. 05–2605, 2007 WL 16069, at *2 (1st Cir. Jan.4, 2007) (*citing O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir.2001)).

■ However, "[t]he Supreme Court has rejected the idea that an employer is strictly liable for a hostile environment created by a supervisor when the employer neither knew nor reasonably could have known of the alleged misconduct." *Chaloult v. Interstate Brands Corp.,* 540 F.3d 64, 73 (1st Cir.2008) (*citing Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 70–72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). "[T]he employer may prevail if it demonstrates a two-part affirmative defense: that its own actions to prevent and correct harassment were reasonable and that the employee's actions in seeking to avoid harm were not reasonable." *Monteagudo v. Asociacion de Empleados del E.L.A.,* 554 F.3d 164, 171 (1st Cir.2009) (*citing Chaloult,* 540 F.3d at 66 (1st Cir.2008)). This affirmative defense is known as the *Ellerth–Faragher* defense. *See Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633

(1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ "As to the first element of the defense, proof of an anti-harassment policy with a complaint procedure available to employees, while not necessarily dispositive, is relevant." *Arrieta–Colon v. Wal-Mart Puerto Rico, Inc.,* 434 F.3d 75, 86 (1st Cir.2006) (*citing Faragher,* 524 U.S. at 807, 118 S.Ct. 2275). However, the first prong of the *Ellerth–Faragher* defense consists of two aspects: (a) that the employer has taken reasonable care to avoid sexual harassment, and (b) that the employer has taken reasonable care to *eliminate* harassment when it might occur. *See Chaloult,* 540 F.3d at 74–75.

■ The Court finds that here there is enough evidence on record to prove that the Hospital did have an acceptable sexual harassment policy and complaint process in place, that the Hospital had trained its employees regarding its policies, and that the Plaintiff knew of these policies. *See, Findings of Fact, supra,* ¶ 9–15. However, issues of fact remain as to whether or not the Hospital's response to the prior charges of sexual harassment against Delgado was reasonable.

Prior to Rivera's internal complaint on November of 2004, the Hospital had knowledge of two prior sexual harassment complaints against Delgado. In September of 1999, Colon, a former secretary in Delgado's department, filed a discrimination charge in the ADU against the Hospital claiming she was a victim of sexual harassment by Delgado. *See, Findings of Fact, supra,* ¶¶ 79–81. Thereafter, on April of 2000, Freytes, a former maid that worked under Delgado's supervision, presented a sexual harassment complaint against him as well. *See, Findings of Fact, supra,* ¶¶ 84–85. According to the

Hospital's own statement of material facts not in controversy, the Hospital gave Delgado another opportunity at the time because of his years of service and in consideration to his wife Noriselle Rivera, Delgado's common-law wife and the Hospital's Finance Director and Board member.[3] *See, Findings of Fact, supra,* ¶¶ 6, 91.

After examining the facts in the light most favorable to the non-movant, in this case Rivera, we conclude that a jury question is presented on the second aspect of the first *Ellerth–Faragher* prong regarding whether or not the Hospital failed to take appropriate corrective actions with regards to Delgado. *See Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321 (6th Cir. 2008) (holding that employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past).

In light of the foregoing, the Hospital's request for summary judgment on Plaintiff's sexual harassment claim is **DENIED.**

## B. Individual Liability under Title VII and Supplemental State Law Claims

In their motion for summary judgment, co-defendants Disdier and Paravisini request that the claims against them be dismissed inasmuch as no personal liability attaches under Title VII. *See* Docket No. 29 at pages 26–28. Plaintiff opposed the dismissal of her claims against the individual defendants citing several theories of law in support of her position.[4] This Court agrees with the defendants that the claims against the individual defendants should be dismissed.

█ Pursuant to Title VII, the term "employer" means, in relevant part, "a person engaged in an industry affecting commerce who has fifteen or more employees …, and any agent of such a person…." 42 U.S.C. § 2000e(b). The issue that arises when a suit is filed against the employer's employees in their individual capacities is whether the employees may be held liable under Title VII as "agents" of the employing entity for engaging in the proscribed discriminatory acts. *See Fantini v. Salem State College,* 557 F.3d 22, 28–29 (1st Cir.2009). Although the Court of Appeals for the First Circuit had declined in the past to decide whether an individual employee may be found liable under Title VII, the Court recently took an opportunity to "enter the thicket of determining this issue." *Fantini,* 557 F.3d at 29 (internal citations and quotation marks omitted).

The First Circuit in *Fantini* noted that "[m]ost circuit courts have held that no personal liability can be attached to agents under Title VII," *id.* at 29 (internal citations omitted), but "[a]fter reviewing the analysis fashioned by all of [its] sister circuits," *id.,* the First Circuit was persuaded

---

**3.** The Court suspects the latter was a weightier reason in the Hospital's decision to not terminate Delgado, the appropriateness of which is a question for the jury to decide.

**4.** In support of her argument, Rivera cites to the Supreme Court of Puerto Rico's holdings in *Hernandez Velez v. Televicentro,* 2006 PRSC 142 (2006). However, Plaintiff's reliance in this case is inapposite inasmuch as the Supreme Court held therein that in an action for damages pursuant to Articles 1802 and 1803 of the Civil Code of Puerto Rico, P.R. LAWS ANN. tit. 31, §§ 5141–5142, an employer is not liable for the acts of sexual harassment of an employee that in no way were in the realm of the harasser's duties and responsibilities or furthered the employer's interests. This holding bears no relation whatsoever to the issues now before the Court.

by their analysis and therefore took this opportunity to determine that there is no individual employee liability under Title VII. *Id.* The Court based its conclusion on the fact that nowhere in the Civil Rights Act does it mention individual liability as an available remedy, as well as the fact that the 1991 amendments to Title VII suggest that Congress only intended employers to be liable for Title VII violations. *Id.* at 30–31. "To permit individual liability would improperly expand the remedial scheme crafted by Congress." *Id.* at 31.

Consequently, there being no individual employee liability under Title VII, we therefore **GRANT** the defendants' request to dismiss Plaintiff's Title VII claims against individual employee defendants Paravisini and Disdier.

■ Now, we move on to the issue of personal liability under Plaintiff's state law claims against the individual employee defendants. The Court first notes that there is no individual supervisor liability under the local wrongful discharge statute, Law No. 80. *See Hernandez v. Raytheon Service Co. Puerto Rico,* No. 05–1937, 2006 WL 1737167, at *2 (D.P.R. April 27, 2006); *Velez Nieves v. Microsoft Caribbean, Inc.,* No. 05–1067, 2006 WL 1805689, at *7–8 (D.P.R. March 15, 2006); *Pacheco Bonilla v. Tooling & Stamping, Inc.,* 281 F.Supp.2d 336, 339 (D.P.R.2003). However, in *Rosario Toledo v. Distribuidora Kikuet, Inc.,* 151 P.R. Dec. 634 (2000), the Supreme Court of Puerto Rico held that, contrary to the most popular interpretation of Title VII, Puerto Rico's laws against discrimination in the workplace, namely, Laws No. 17, 69 and 100, impose civil liability on the agent, official, administrator or supervisor of an employer in his/her personal capacity for the acts of

sexual harassment complained of when he/she is the direct author of the conduct in question.[5] *Id.* at 644.

■ After a comprehensive reading of *Kikuet,* we find that the Court's imposition of personal liability is on the supervisor that actually commits the acts of discrimination or sexual harassment. The uncontested facts of this case demonstrate that neither Paravisini or Disdier committed the acts of sexual harassment Rivera complains of herein. Pursuant to *Kikuet,* Plaintiff's claims under Puerto Rico Laws No. 17, 69 and 100 would have only prospered against Delgado. Accordingly, Plaintiff's claims under Puerto Rico Laws No. 17, 69 and 100 against Paravisini and Disdier are hereby dismissed with prejudice.

■ With regards to personal supervisor liability under Puerto Rico's statute prohibiting retaliation in the workplace, Law No. 115, the Puerto Rico Court of Appeals found that it stems from the text of the act that the sanctions imposed therein are only against the employer, and thus, the statute contains no provision imposing personal liability. Accordingly, any action commenced under the provisions of Law No. 115 shall be filed only against the employer. *See Vargas Santiago v. Lilliam Alvarez Moore,* No. DPE–2004–0541, 2006 WL 3694659, at *5 (P.R. Cir. Nov. 29, 2006). In accordance with the foregoing, we find that Plaintiff's Law No. 115 claims against Paravisini and Disdier should also be dismissed.

Accordingly, this Court **GRANTS** defendants' request to dismiss with prejudice all of Plaintiff's claims against co-defendants Disdier and Paravisini.

---

**5.** In *Rosario Toledo v. Distribuidora Kikuet, Inc.,* 151 P.R. Dec. 634 (2000), the Supreme Court of Puerto Rico found the employer's president personally liable for causing the plaintiff's damages because he was the plaintiff's sexual harasser.

## C. Title VII Retaliation Claim

In their motion for summary judgment, the defendants argue that the Plaintiff lacks a cause of action for retaliation inasmuch as Rivera has not suffered any adverse employment action, as required by the relevant test. Rivera responds that contrary to what the defendants argue, the continued sexual harassment she endured as well as the Hospital's failure to reinstate her after the investigation of her complaint was finalized amounted to adverse employment actions.

■ This Court will first set forth the applicable standard for claims of retaliation claims under Title VII. Title VII specifically states that it shall be unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3. In order to make out a prima *facie case* of retaliation under Title VII, a plaintiff must show that: "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Enica v. Principi,* 544 F.3d 328, 343 (1st Cir.2008) (*citing Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 25 (1st Cir.2004)).

■ "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Fantini,* 557 F.3d at 31 (internal citations omitted). "Protected conduct includes not only the filing of administrative complaints, ..., but also complaining to one's supervisors." *Valentin–Almeyda v. Municipality Of Aguadilla,* 447 F.3d 85, 94 (1st Cir.2006) (*citing Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 175 (1st Cir. 2003)). Adverse employment actions may "include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees," *Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 23 (1st Cir.2002) (internal citations omitted), as well as "toleration of harassment by other employees." *Rivera–Martinez v. Commonwealth of Puerto Rico,* No. 05–2605, 2007 WL 16069, at *4 (1st Cir. January 04, 2007) (internal citations omitted).

■ "For a plaintiff to prove retaliation based on an employer's toleration of harassment, she must show that the employer tolerated severe or pervasive harassment motivated by the plaintiff's protected conduct." *Id.* For a retaliation claim based on toleration of harassment by other employees to be viable, "[the plaintiff] she must provide evidence of severe or pervasive harassment subsequent to her protected conduct." *Id.*

In her opposition, Rivera maintains that on April 2004, she met with Mr. Picon and told him that "there were things happening" and that she was interested in a change. Despite her complaint, she claims she was not transferred, and instead, continued enduring a hostile work environment and Delgado's harassment. *See* Docket No. 31, Exhibit 1 at page 111. The defendants argue that, on the contrary, Rivera never presented any complaint or reservation to Picon regarding Delgado's conduct. In addition, they submit that she never requested a transfer, that instead, it was Picon the one who told her that he was planning on transferring her due to administrative reasons. See Docket No. 45 at page 13.

Rivera also argues that as a result of her internal complaint and her discrimina-

tion charge in the ADU, neither Disdier nor Paravisini informed her of Delgado's resignation, and thus, she never returned to work. According to Rivera, the Hospitals's actions after her formal complaints amounted to a constructive discharge. Therefore, she claims she is able to establish that she suffered an adverse employment action as a result of engaging in a protected conduct. *See* Docket No. 52 at pages 10, 15–18. On the other hand, the defendants contend that on December 9, 2004, Dr. Disdier and Paravisini met with Rivera to inform her that Delgado would no longer work at the Hospital, and that since she wished to stay in her same area of work, the Hospital would leave her there. *See* Docket No. 26 ¶ 28.

With regards to Rivera's retaliation claim that rests on the Hospital's toleration of harassment by Delgado, there is an issue of fact in controversy as to whether or not Rivera engaged in protected conduct in April of 2004 by complaining to Picon. Now, as to Rivera's claim of retaliation after she filed the internal complaint and the charge in the ADU, there is an issue of fact as to whether or not the aftermath of her complaints amounts to a constructive discharge.

In light of the foregoing, defendants' request for summary judgment on both the federal and state [6] retaliation claims is inappropriate, and thus, **DENIED.**

### D. Constructive Discharge Claim

"Puerto Rico's Law 80 prohibits dismissal of employees without just cause." *Navas v. Multisystems Restaurants, Inc.,* No. 06–2163, 2008 WL 747074, at *10 (D.P.R. March 18, 2008) (*citing Alvarez–Fonseca v. Pepsi Cola of P.R. Bottling Co.,* 152

F.3d 17, 28 (1st Cir.1998)). Under Puerto Rico's wrongful discharge statute, a constructive discharge is:

> ... the resignation of the employee caused by the actions of the employer directed to induce or compel him to resign, such as imposing or trying to impose on him more onerous working conditions, reducing his salary, lowering his category or submitting him to derogatory criticisms or humiliations by deed or word.

P.R. LAWS ANN., tit. 29 § 185e.

"The basic elements for a constructive discharge claim [under Law No. 80] are: (1) considerably serious actions by the employer that create an intimidating, hostile and offensive work environment; and (2) for the employee to have no other available alternative but to resign." *Rivera v. DHL Global Forwarding,* 536 F.Supp.2d 148, 156 (D.P.R.2008) (internal citation omitted). "This is an objective standard in which the focus is upon the reasonable state of mind of the putative discriminatee." *Flamand v. American Intern. Group, Inc.,* 876 F.Supp. 356, 369 (D.P.R.1994) (internal quotation marks omitted) (*citing Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir. 1986)). "The plaintiff must clearly detail the acts that allegedly motivated her resignation and demonstrate the magnitude of the onerous working conditions; a mere annoyance or disagreement with the employer's measures is insufficient to sustain a constructive discharge claim." *Navas,* 2008 WL 747074, at *10.

"As with the causes of action discussed above, the threshold question under the Law 80 analysis is whether plaintiff

---

**6.** "Provided that Puerto Rico Law No. 115 ... is a statute parallel to the federal statute, the Court cannot dismiss this supplemental jurisdiction claim while the retaliation claim under Title VII remains alive within this Court's jurisdiction." *Sanchez Ramos v. Puerto Rico Police Dept.,* 392 F.Supp.2d 167, 179 (D.P.R.2005).

can raise an issue of material fact as to whether she was constructively discharged from [her employment]." *Id.* As mentioned in the previous section, issues of fact remain as to whether or not Rivera was informed that Delgado had been terminated following the investigation of her complaint. *See* Docket No. 31, Exhibit 1 at pages 153–154. Accordingly, this Court is unable to make the necessary inferences to determine whether or not, judging from Rivera's state of mind, she was unable to return to work because her working conditions were going to continue to be so intolerable that the only reasonable alternative for her was to not return. Therefore, defendant's motion for summary judgment on the Law No. 80 claim is **DENIED.**

### E. Remaining Supplemental Claims

The remainder of Plaintiff's claims are grounded on Puerto Rico law. Because this Court has not dismissed Plaintiff's federal law claim for sexual harassment and retaliation under Title VII, her state law claims also remain pending before this Court.

### V. CONCLUSION

For all the reasons set forth above, this Court **GRANTS IN PART AND DENIES IN PART** defendants' motion for summary judgment (Dockets No. 25–26, 29). Accordingly, this Court hereby DISMISSES Plaintiff's claims against individual defendants Nilda Paravisini and Dr. Carlos Disdier. Partial judgment shall be entered accordingly. Pending before the Court remain Plaintiff's claim for sexual harassment and retaliation under Title VII, as well as her state-law claims.

**IT IS SO ORDERED.**